UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DEREK BOYD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:20-cv-01844-TWP-TAB |
| | ) |
| A. REAVES, Warden | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| LAYE, Sergeant | ) |
| LOPES, | ) |
| JULIA L. MONK, | ) |
| ROBERT E. CARTER, Commissioner | ) |
| DARLA E. MARTENS, | ) |
| FERREE, Nurse | ) |
| TODD OSTERBUR, Nurse | ) |
| | ) |
| Defendants. | ) |

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Motions for Summary Judgment filed by the parties. Plaintiff Derek Boyd ("Mr. Boyd") was incarcerated at Heritage Trail Correctional Facility ("HTCF") when COVID-19 began to spread in Indiana in March and April of 2020. He filed this lawsuit alleging that personnel at HTCF, the Indiana Department of Correction ("IDOC"), and their medical care provider failed to take appropriate precautions to prevent the spread of the coronavirus, then failed to properly treat him once he contracted it. On April 5, 2022, Mr. Boyd filed a Motion for Summary Judgment (Dkt. 192). Thereafter, Defendants Nicole Ferree ("Nurse Ferree"), Darla E. Martens ("Nurse Martens"), Julia L. Monk ("Nurse Monk"), Todd Osterbur ("Nurse Osterbur"), and Wexford Health Sources, Inc., ("Wexford") filed a Motion for Summary Judgment (Dkt. 211); Defendants Angela Reaves ("Warden Reaves") and Sergeant Laye filed a Motion for Summary Judgment (Dkt. 215); and Defendant Robert E. Carter ("Commissioner

Carter") filed his Motion for Summary Judgment (Dkt. 219). Also pending are two Motions for Sanctions filed by Mr. Boyd (Dkts. 233, 239). For the reasons stated below, Mr. Boyd's Motion for Summary Judgment is **denied** and the Defendants' Motions are **granted**. Mr. Boyd's Motions for Sanctions against the Defendants are **taken under advisement** and will be addressed in a separate order.

## I. STANDARD OF REVIEW

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Federal Rule of Civil Procedure 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II. CLAIMS AND PARTIES

The operative pleading in this action is Mr. Boyd's Second Amended Complaint, (Dkt. 132), which alleges that staff members at HTCF made bad decisions—individually and systemically—that allowed COVID-19 to spread through his housing unit in April 2020 and caused him to catch the coronavirus. At screening, the Court identified plausible Eighth Amendment claims against nine defendants. Robert Carter is Commissioner of the IDOC. Angela Reaves was HTCF's Warden and was employed by GEO, a private entity which managed HTCF. Sergeant Laye and Sergeant Lopes were also GEO employees at HTCF. Wexford contracted to provide medical services to all IDOC inmates, including those at HTCF. Nurses Monk, Martens, Ferree, and Osterbur were all Wexford employees working at HTCF.

## III. FACTUAL BACKGROUND

Ordinarily, when parties file cross-motions for summary judgment, the court considers the motions "one at a time," construing the evidence and drawing reasonable inferences in favor of the

non-movant. *American Family Mut. Ins. v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016). That is not necessary here. Even when all evidence is interpreted in Mr. Boyd's favor, the Defendants are entitled to summary judgment.

A.   **COVID-19 Spread and Protocols**

Like everyplace else in America, the spread of COVID-19 became a concern at IDOC facilities in March and April of 2020. (*See* Dkt. 213-1 at ¶ 4; Dkt. 213-2 at ¶ 3 ; Dkt. 213-3 at ¶ 4; Dkt. 213-4 at ¶ 5.) The IDOC updated its Pandemic Preparedness and Response Plan in March of 2020. (Dkt. 217-2.) The plan's specific provisions ultimately are immaterial to the parties' summary judgment motions, but for purposes of the pending motions, it suffices to note that the Preparedness and Response Plan:

- charged each warden with implementing a facility-specific Infectious Disease Control Plan. *Id.* at 3–4.

- establish minimum standards for facility-specific plans, including provisions for promoting hand washing and hygiene, cleaning common areas and surfaces, and identifying and treating infected inmates. *Id.* at 4–9.

- provided for testing and quarantining symptomatic inmates on multiple scales. *Id.* at 9–10.

- directed appropriate personnel to obtain and distribute personal protective equipment and disinfectants, noting that supply chain disruptions may complicate these efforts. *Id.* at 10.

The parties have not filed HTCF's facility-specific plan. However, Warden Reaves maintains that HTCF implemented practices and procedures based on recommendations of the Centers for Disease Control and Prevention and other health experts. (Dkt. 217-3.)

B.  **Spread of COVID-19 Among HTCF Staff**

In early 2020 the coronavirus began to spread among staff members and inmates at HTCF. One employee, Sergeant Lopes, worked in Mr. Boyd's unit until approximately April 6, 2020 and Mr. Boyd has not seen him since that time. (Dkt. 213-5 at 21–22, dep. pp. 81:25–82:10.) It was rumored that Sergeant Lopes contracted COVID-19 and spread it to others in the facility. *Id.* at 22, dep. p. 82:20–24. Mr. Boyd believes that Sergeant Lopes was fired in retaliation for spreading the virus. *Id.* at dep. p. 82:11–19. He cannot, however, cite evidence to support either the rumor that Sergeant Lopes contracted and spread the virus or his speculation that the prison administration fired Sergeant Lopes as a result. *See id.* at 22–23, dep. p. 83:1 ("I can't say Lopes gave it to me, no."), 86:4–5 ("I mean, I don't know whether that's factual or not.").

Sergeant Laye became ill approximately a week after Mr. Boyd last saw Sergeant Lopes. Sergeant Laye began to complain of a severe headache and exhaustion on the afternoon of April 12, 2020. (Dkt. 217-5.) Nurse Osterbur checked Sergeant Laye's vital signs, found that his blood pressure was high, and called an ambulance to transport Sergeant Laye to the hospital. *Id.* Several weeks later, Sergeant Laye informed Mr. Boyd he had been sick with COVID-19 and was still fatigued. (Dkt. 213-5 at 23, dep. pp. 87:14–19.)

Mr. Boyd observed Sergeant Laye "hacking and coughing" on or before April 12, 2020. *See id.* at 11, dep. pp. 40:24–41:7. Warden Reaves announced to the prison staff on April 14, 2020 that one HTCF employee had tested positive for COVID-19 and had not been in the facility since April 12, 2020. (Dkt. 154-2 at 6–7.) However, no evidence in the record confirms whether Sergeant Laye had COVID-19 when he left work ill on April 12, 2020, or whether he was the

subject of Warden Reaves' April 14, 2020 communications. *See* Dkt. 213-5 at 12, dep. p. 45:5–14.[1]

### C.   Mr. Boyd Contracts COVID-19

Mr. Boyd tested positive for COVID-19 on May 7, 2020. (Dkt. 213-6 at 23.) He does not know how or when he contracted the virus. *Id*. Mr. Boyd met with Nurse Monk on April 8 and 10, 2020 and with Nurse Practitioner Dillon on April 13, 2020. *Id.* at 15–22. According to records from those visits, Mr. Boyd sought treatment for back pain and an umbilical hernia but did not report COVID-19 symptoms. *Id.*

Mr. Boyd testified that he believes he became ill with COVID-19 around April 8 or 9, 2020. (Dkt. 213-5 at 11, dep. p. 41:11–22.) At that time, he was working in the kitchen at HTCF, and kitchen workers were required to begin wearing masks, but Mr. Boyd could not breathe through his. *Id.* It is not clear whether Mr. Boyd struggled to breathe through his mask because he was sick or because of the mask itself. *See id.* at 13–14, dep. pp. 48:20–51:1 (discussing quality of masks; "I am not a medical professional to know whether or not. I just know, like I said, not able to breathe, I am not going to stand down there in the kitchen and work in a mask that I can't breathe through.").

Mr. Boyd believes he became ill with COVID-19 on or around April 12, 2020 when Sergeant Laye either assembled or distributed inmates' sack lunches. *See id.* at 11, dep. pp. 40:14–41:7; *id.* at 31, dep. pp. 120:14–21 ("I think I caught it after the exposure from Laye putting the

---

[1] Q   But do you know if he actually had COVID on 4/12, that day?
   A   According to Sergeant Laye, he had Covid when he went to the hospital.
   Q   Here's my question: do you know if he was actually tested on 4/12?
   A   Unless he is lying to me, I don't know.
   Q   Hold on. Did he tell you that he was tested on 4/12?
   A.   He didn't, no.

(Dkt. 213-5 at 12).

food in everybody's sacks."). Mr. Boyd lost his senses of taste and smell around April 15 or 16, 2020. *Id.* at 23, dep. p. 89:8–12. On April 17, 2020, another inmate was removed from Mr. Boyd's unit and placed in quarantine. *Id.* at 14, dep. pp. 51:24–52:4. That inmate tested positive for COVID-19 on April 20, 2020. *Id.*

Mr. Boyd saw a nurse twice on May 5, 2020 and complained of body aches and fatigue in addition to his lost senses of taste and smell. (Dkt. 213-6 at 12–14.) Mr. Boyd was placed in a quarantine unit. (Dkt. 213-5 at 7, dep. p. 22:8–19.) He remained there for two weeks. *Id.* at 17, dep. p. 63:5–17. In quarantine, medical treatment was limited to Tylenol, which Mr. Boyd refused. *Id.* at 30, dep. pp. 115:10–116:6.

Mr. Boyd believes he should have been tested for COVID-19 and quarantined by April 22, 2020 after the other inmate from his unit tested positive. *Id.*, dep. pp. 114:25–115:9. He doubts that he would have received any different treatment had he tested positive and been quarantined earlier. *Id.*, dep. p. 116:7–24. Mr. Boyd believes, however, that he would have had "access to some type of medical professional" who could tell him he was "not dying." *Id.*, dep. pp. 114:25–115:9.

## IV.  DISCUSSION

"Prison officials violate the [Eighth Amendment's] prohibition on cruel and unusual punishment if they act with deliberate indifference to a prisoner's serious medical condition." *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "A medical condition is serious if it 'has been diagnosed by a physician as mandating treatment' or 'is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). A prison official can also violate the Eighth Amendment through deliberate indifference to an "excessive risk to inmate health or

7

safety." *Estate of Miller ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012) (cleaned up).

The court applies the same deliberate indifference standard whether considering a hazardous condition or medical treatment. "As its name implies, deliberate indifference requires 'more than negligence and approaches intentional wrongdoing.'" *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)). "[T]he evidence must show that the prison official . . . knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Id.*

Mr. Boyd devotes much of his summary judgment briefing to issues that ultimately make no difference to these legal issues. These include, for example, whether nurses accurately recorded inmates' answers on screening questionnaires on April 22, 2020, after Mr. Boyd already had COVID-19 symptoms; who actually wrote inmates' answers on those questionnaires; and how accurately or honestly the prison staff portrayed its COVID-19 response to the public.

Consistent with the legal standards set out above, the Court focuses its analysis on the following questions:

- Was the defendant aware of a substantial risk to inmates' health and safety before Mr. Boyd was infected with COVID-19 in April 2020?
- Did the defendant knowingly disregard such a risk?
- Did the defendant's conduct cause Mr. Boyd to be exposed to the virus?
- Once Mr. Boyd contracted the virus, was any defendant deliberately indifferent to Mr. Boyd's serious medical needs?

**A.      Sergeant Laye**

Viewed in the light most favorable to Mr. Boyd, the evidence shows that Sergeant Laye had a cough sometime before April 12, 2020, came to work at the prison, distributed inmates' lunches, and then became dangerously ill with a headache, fatigue, and high blood pressure. He

later told Mr. Boyd that he had COVID-19, and Warden Reaves announced on April 14, 2020 that an employee who was last at the facility on April 12, 2020 had tested positive for COVID-19.

No evidence—in any light—verifies that Sergeant Laye had COVID-19 when he came to work on April 12, 2020. More important for Eighth Amendment purposes, no evidence indicates that Sergeant Laye *knew* he had a substantial risk of passing COVID-19 to inmates but came to work anyway.

Maybe Sergeant Laye was sick with COVID-19 on April 12, 2020. Perhaps the wiser and more responsible choice would have been to stay home. And perhaps a jury could review the evidence noted above and infer that Sergeant Laye must have at least known he was sick, considered the possibility that he had COVID-19, and disregarded the risk that he would spread it to inmates. On the current evidentiary record, though, this inference "veers too far into speculation to survive summary judgment." *Jones v. Van Lanen*, 27 F.4th 1280, 1286 (7th Cir. 2022). Without evidence that Sergeant Laye knew he had a substantial risk of passing COVID-19 to inmates, a reasonable jury could find no more than negligence—not the "intentional wrongdoing" that amounts to deliberate indifference. *Goodloe*, 947 F.3d at 1030. As such, Sergeant Laye is entitled to summary judgment.

B.  **Nurse Osterbur**

Mr. Boyd asserts that Nurse Osterbur should have acted more aggressively to prevent the spread of COVID-19 after interacting with Sergeant Laye on April 12, 2020. *See* Dkt. 192 at 10; Dkt. 213-5 at 9–10, dep. pp. 30:2–37:6. Specifically, Nurse Osterbur should have suggested that at least some people be tested for COVID-19 and that the unit be sanitized. *Id.* at 9, dep. pp. 30:2–32:1. However, Mr. Boyd admits that no evidence shows that Nurse Osterbur knew that Sergeant

9

Laye had COVID-19 or that he had been exposed to it. *See id.* at 10, dep. pp. 35:20–36:17.[2] The record before the Court would not allow a reasonable jury to conclude without speculating that Nurse Osterbur knew of a substantial risk to inmates' health and safety after assisting Sergeant Laye, much less that he disregarded such risk.

### C.     Nurses Monk, Martens, and Ferree

Mr. Boyd's claims against Nurses Monk, Martens, and Ferree are even more attenuated. In short, he alleges that these Defendants screened inmates for COVID-19 exposure and symptoms on April 22, 2020 and falsely marked on every questionnaire that the inmate had not been exposed by close contact to a person known to have COVID-19. *See* Dkt. 213-5 at 6, dep. pp. 19:14–21:17; Dkt. 26 at 32 (coronavirus screening tool). Mr. Boyd characterizes the Defendants as "falsifying" these documents because, at that time, Sergeant Laye had been taken to the hospital, and an inmate had been removed from Mr. Boyd's housing unit and tested positive for COVID-19.

Assuming the nurses knew inmates had been in close contact with the virus, and assuming they intentionally wrote otherwise on the screening questionnaires, no reasonable jury could find them liable to Mr. Boyd. "[T]here is no tort without an actionable injury caused by the defendant's wrongful act." *Fields v. Wharrie*, 740 F.3d 1107, 1111 (7th Cir. 2014). This is true "even in the field of constitutional torts." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). By his own

---

[2] Q     Where do you make the leap that Osterbur knew that he had COVID and should have been raising five star alarms [. . .]?
A     Right. And I am not really sure. And that's something that a jury has to determine if it makes it that far. Because that, to me, tells me that, you know, one, a medical registered nurse would likely assume that that's a COVID symptom.
Q     Why?
A     I'm not sure. I mean, because he had been exposed to COVID by Lopes.
Q     And how would Osterbur know that?
A.     Well, I'm not sure where the document is.

(Dkt. 213-5 at 10)

account, Mr. Boyd already had COVID-19 when the nurses "falsified" the screenings on April 22, 2020.  Indeed, they noted on Mr. Boyd's screening that he had been unable to smell or taste for approximately two weeks.  (Dkt. 26 at 32.)  Further, Mr. Boyd acknowledged in his deposition that completing the screening differently would not have resulted in him receiving materially different treatment.  Perhaps he would have been moved to a quarantine unit earlier, but there he would only have received Tylenol and temperature checks.  (Dkt. 213-5 at 8, dep. pp. 27:18–29:5.)

Resolving all factual disputes and drawing all plausible inferences in Mr. Boyd's favor, no jury could reasonably find that any of the nurses caused him to contract COVID-19, delayed his receipt of treatment for COVID-19, or prevented him from receiving treatment that might have alleviated his symptoms.  Accordingly, Nurses Osterbur, Monk, Martens, and Ferree are entitled to summary judgment.

**D.     Warden Reaves**

Mr. Boyd alleges that Warden Reaves violated his Eighth Amendment rights "by not mandating safe and sanitary operations as the Facility Administrator." (Dkt. 192 at 10.)  Mr. Boyd does not expand significantly on this allegation but does point to the April 14, 2020 communications in which Warden Reaves announced that one HTCF employee had tested positive for COVID-19.  (Dkt. 154-2 at 6–7.)  These communications do not identify the employee but clarify that he or she had not been in the facility since April 12, 2020.  *Id.*  The memorandum and email warn employees to complete a wellness screening every day before reporting to work, stay home if sick, wear face masks, and adhere to all other guidelines.  *Id.*

Mr. Boyd argues that once Warden Reaves knew enough to send the April 14, 2020 memorandum and email, she should have ordered more aggressive containment measures, such as a deep cleaning of his housing unit.  *See* Dkt. 213-5 at 20, dep. pp. 76:16–77:1.  Instead, the unit

was not sanitized until April 28, 2020. *Id.*  This argument suffers from numerous factual and legal shortcomings.

First, Mr. Boyd has identified a document showing that Warden Reaves knew by April 14, 2020 that *an employee* had tested positive.  This is not evidence that she knew that *an employee who had close contact with Mr. Boyd* tested positive.  Mr. Boyd suspects the employee who tested positive on April 12, 2020 was Sergeant Laye, but he has not pointed to evidence to confirm that suspicion.  A reasonable jury therefore could not conclude from the April 14, 2020 correspondence that Warden Reaves knew of an excessive risk to Mr. Boyd's health and safety.

Second, whatever risk Warden Reaves appreciated by April 14, 2020, she responded to it by notifying employees of required precautions, including health screenings and masking.  "The test of deliberate indifference ensures that the mere failure of the prison official to choose the *best* course of action does not amount to a constitutional violation."  *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) (citing *Farmer*, 511 U.S. at 844) (emphasis added).  Warden Reaves responded to the April 14, 2020 positive test.  Mr. Boyd's submissions do not explain how failing to proceed with his preferred response—an immediate deep clean—crossed the line to deliberate indifference.

Finally, as with the other Defendants, Mr. Boyd has not explained how Warden Reaves' response on April 14, 2020 injured him.  By his account, he was exposed to the virus no later than April 12, 2020.  It is unclear how a deep clean on April 14, 2020 would have prevented Mr. Boyd from becoming ill, much less how Warden Reaves' failure to order that deep clean amounted to deliberate indifference.

Mr. Boyd also alleges that Warden Reaves responded to grievances "in bad faith" and as late as she possibly could under the grievance policy.  (Dkt. 192 at 10; Dkt. 213-5 at 20, dep. pp. 74:3–76:3.)  But the grievances Mr. Boyd cites do not appear to have reached Warden Reaves until

12

well after Mr. Boyd became ill from the virus, and he does not explain how a jury could find that her responses negatively affected his medical treatment. *See* Dkt. 154-2 at 10–11, 14–15, 17–19. Accordingly, Warden Reaves is entitled to summary judgment.

**E.    Commissioner Carter**

Mr. Boyd asserts that Commissioner Carter was deliberately indifferent to his health and safety in three ways.

First, he asserts that Commissioner Carter could have stopped moving new prisoners into HTCF in early April 2020. (Dkt. 192 at 11.) However, Mr. Boyd acknowledges that inmates who arrived at HTCF in early April 2020 were quarantined. *See* Dkt. 213-15 at 34–35, dep. pp. 133:18–134:7. He has not explained how a reasonable jury could infer that he contracted COVID-19 from a new inmate under these circumstances. Moreover, he has again failed to explain how Commissioner Carter acted with deliberate indifference by moving new inmates to HTCF and quarantining them rather than implementing Mr. Boyd's preferred response. *See Peate*, 294 F.3d at 882.

Second, Mr. Boyd asserts that Commissioner Carter erred by permitting the IDOC's chief medical officer, Dr. Kristen Dauss, to set testing protocols. (Dkt. 192 at 11.) Mr. Boyd does not explain how delegating that policy choice to a medical professional amounts to deliberate indifference. More broadly, Mr. Boyd states that Nurse Ferree told him that HTCF only received 25 COVID-19 tests, *see* Dkt. 213-5 at 7, dep. p. 22:13–15, and he believes that the IDOC "had more testing capacity," *id.* at 30, dep. p. 114:8–9. However, Mr. Boyd concedes that he has no evidence from which a jury could conclude that the IDOC had access to more tests, much less that Commissioner Carter knowingly prevented those tests from reaching HTCF.[3] *See id.* at 16, dep.

---

[3] To the extent Mr. Boyd argues that Commissioner Carter had the burden to produce evidence showing he attempted to obtain more tests, *see* Dkt. 231, the Court notes that Mr. Boyd filed at least six motions to compel in this action.

p. 60:13–20;[4] *id.* at 30, dep. p. 114:10–11.[5] "Inferences that are supported only by speculation or conjecture will not defeat a summary judgment motion." *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022).

Third, Mr. Boyd asserts that conditions at HTCF would have been better had Commissioner Carter "made appearances at least once a month to the prison." (Dkt. 213-5 at 33, dep. pp. 127:20–128:1.) But Mr. Boyd has not identified a specific problem at the prison that was caused by Commissioner Carter's failure to make in-person visits. He also has not pointed to evidence from which a reasonable jury could conclude that Commissioner Carter's failure to make in-person visits amounted to deliberate indifference, caused Mr. Boyd to contract COVID-19, worsened his symptoms, or prevented him from receiving better treatment. Commissioner Carter is entitled to summary judgment.

### F.  Wexford

As a corporate entity that has contracted to provide a government function, Wexford's potential liability is governed by *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See Dean v. Wexford Health Sources, Inc.*, 18 F. 4th 214, 235 (7th Cir. 2021). Thus, Wexford cannot be "vicariously liable" to Mr. Boyd "for the constitutional torts of [its] employees or agents." *Id.* To the contrary, Wexford may only be liable if Mr. Boyd can show that he has been deprived of a federal right and that the deprivation was caused by a Wexford policy or custom. *Id.*

---

*See* Dkts. 85, 86, 89, 107, 131, 185. Mr. Boyd does not point to any of these motions as involving requests for such evidence or interrogatories concerning attempts to obtain tests.

[4] Q    So to answer my question, though, you have alleged a grand conspiracy to cover up positive cases at Heritage Trail. Is it possible, though, that you are mistaken, and that literally the state only had so many tests and they were trying to make sure those resources were directed to the places that they were most necessary?
A    I mean, you got me.

[5] Q    Do you know how many tests IDOC had in total?
A    I do not.

He can do so by attributing the violation of his rights to an "express policy," "a widespread practice," "a person with final policymaking authority," or a "conscious decision not to take action." *Id.* (internal quotations omitted). If he can clear this hurdle, Mr. Boyd must also show that the Wexford policy or practice in question amounted to deliberate indifference and that it was the "moving force" behind the violation of his rights. *Id.*

Mr. Boyd alleges only that Wexford failed to ensure that an adequate number of COVID-19 tests reached the prison in March, April, and May 2020. *See* Dkt. 192 at 28, 32. But Mr. Boyd acknowledges that testing protocols were implemented by the IDOC, not Wexford. (Dkt. 213-5 at 15, dep. p. 56:23–25.)[6] And, to the extent Mr. Boyd alleges that Wexford failed to implement a more robust testing policy or obtain more tests, he has not pointed to any evidence from which a jury could conclude those steps were possible at that time. With both individual and corporate defendants, a plaintiff must prove "conscious disregard" for a serious risk that a right would be violated. *Dean*, 18 F.4th at 235. In this context, that means proving that Wexford declined to implement a more robust testing program or declined to obtain readily available tests knowing full well that doing so exposed inmates to a serious risk of contracting and suffering from COVID-19. Because Mr. Boyd has pointed to no evidence that more tests were available, Wexford is entitled to summary judgment.

## V. CONCLUSION

Mr. Boyd's Motion for Summary Judgment, Dkt. [192], is **DENIED**. The Defendants' Motions for Summary Judgment, Dkts. [211], [215], and [219], are **GRANTED**. Claims against Warden Reaves, Wexford, Sergeant Laye, Nurse Monk, Commissioner Carter, Nurse Martens, Nurse Ferree, and Nurse Osterbur are **DISMISSED with prejudice**.

---

[6] Q   In late April of 2020, do you know who created the testing policy that was in place at Heritage Trail?
  A   I am assuming it was Dr. Dauss.

Claims against Sergeant Lopes remain pending, as do Mr. Boyd's Motions for Sanctions against the Defendants, (Dkts. 233 and 239). The Court will address these matters in separate orders. Given the pending Motions for Sanctions, the Court will not enter partial final judgment at this time.

**SO ORDERED.**

Date: 9/13/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Derek Boyd, #273507
PLAINFIELD CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Adam Garth Forrest
BBFCS ATTORNEYS
aforrest@bbfcslaw.com

Joseph Thomas Lipps
BBFCS ATTORNEYS
jlipps@bbfcslaw.com

Douglass R. Bitner
STOLL KEENON OGDEN PLLC
doug.bitner@skofirm.com

Julie Tront
INDIANA ATTORNEY GENERAL'S OFFICE
julie.tront@atg.in.gov

Peter Andrew Inman
INDIANA ATTORNEY GENERAL'S OFFICE
peter.inman@atg.in.gov